# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

SUE EVERS, *et al.*,

       Plaintiffs,

vs.                                               Civ. No. 06-00292 MV/LAM

BOARD OF COMMISSIONERS OF
TORRANCE COUNTY, *et al.*,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on County Defendants'[1] Motion for Summary Judgment on Counts I, II, IV, VI - XV of Plaintiffs' Amended Complaint, filed September 6, 2007, **[Doc. No. 125]**, County Defendants' Motion for Summary Judgment Regarding Florenio Aragon's Claims Against the County Defendants, filed September 13, 2007, **[Doc. No. 136]**, and Plaintiffs' Motion for Summary Judgment Against Defendants DuBois and Dunn, and Against Potential Defendant Satterfield as to Counts I, II, and VII, filed October 17, 2007, **[Doc. No. 164]**.[2]   The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that County Defendants' motions are well-taken and will be **GRANTED in part**

---

[1]   The term "County Defendants" is used to refer to defendants Board of Commissioners of Torrance County, Bob Ayre, Pete Golden, Chuck Dubois, Richard Ledbetter and Clarence Gibson.

[2]   Plaintiffs' motion to add Mark Satterfield as a defendant was denied as futile because Plaintiffs' claims against Satterfield are barred by the applicable statutes of limitations.  *See* February 1, 2008 Order [Doc. No. 236].  Consequently, Satterfield is not a defendant in this case and the Court will disregard the portions of Plaintiffs' motion seeking summary judgment against Satterfield.

while Plaintiffs' motion is not well-taken and will be **DENIED**.[3]

## FACTUAL BACKGROUND[4]

This case arises out of a property dispute between Plaintiff Sue Evers and Defendants

Andrew and Jill Akard.[5]  On or about September 4, 2001, Sue Evers, who is mentally impaired,[6]

purchased a mobile home and a parcel of real estate located at 10 Red Diamond Road, Torrance

County, New Mexico, from Andrew Akard.  Sue Evers filed a Warranty Deed, signed by both

parties, for the land with the Clerk of Torrance County.  Andrew Akard transferred title of the

mobile home at 10 Red Diamond Road to Sue Evers by recording the transfer on the back of the

---

[3]  Plaintiffs devoted over twenty pages of their Consolidated Response to County Defendants' two motions for summary judgment to summarizing the testimony of various defendants and then generally cited to this narrative in their response to County Defendants' undisputed facts.  In their reply, County Defendants moved to strike Plaintiffs' narrative as not complying with local rules.  County Defendants' motion is procedurally improper.  By local rule, every motion must be a separate document.  *See* Administrative Order 92-88 (requiring all practitioners before the Court to submit a separate pleading for each matter upon which a ruling is sought).  The Court agrees, however, that Plaintiffs' Response does not comply with D.N.M.LR-Civ. 56.1(b) and that this non-compliance made it difficult for County Defendants to reply to Plaintiffs' response and for the Court to rule on the motions.  The Court, however, will decline to strike the response.  *See Walker v. City of Orem*, 451 F.3d 1139, 1156 (10th Cir. 2006) (deferring to the district court's decision to consider the plaintiff's statement of facts, despite a failure to comply with a local pleading rule).  Plaintiffs are cautioned not to expect such leniency in the future.

[4]  The facts are stated in the light most favorable to the Plaintiffs because County Defendants are seeking summary judgment on nearly every count while Plaintiffs seek summary judgment on only three counts.  When the Court analyzes the three counts upon which Plaintiffs seek summary judgment, it will restate the facts in the light most favorable to the defendants against whom those counts are brought.

[5]  Andrew Akard and Jill Akard were married at the time of the events at issue in this lawsuit.  They subsequently divorced and Jill Akard changed her name to Jill Dunn.  To avoid any confusion, this opinion will continue to refer to her as Jill Akard.

[6]  Various medical reports in the record describe Sue Evers as having "obvious severe mental retardation," and as having a "Full Scale IQ" of 45.

Certificate of Title.  Sue Evers then registered the mobile home with the New Mexico Motor Vehicle division and was issued a Certificate of Title.  On or about November 13, 2002, Sue Evers transferred the real estate and trailer into the name of her son, Plaintiff Florenio Aragon, Jr.

From the time of the purchase from Andrew Akard, Sue Evers inhabited the mobile home at 10 Red Diamond Road and paid all of the taxes associated with the property.  In March of 2004, approximately two and a half years after the purchase of the property, Sue Evers left 10 Red Diamond Road to stay in Albuquerque for approximately two weeks for a series of medical appointments.  When Sue Evers returned to her home on or about April 11, 2004, she found that the skirting to the trailer had been removed, her clothes and personal effects had been strewn about the property, and the carpet that she had recently installed had been ripped up and thrown outside.  The locks to the home had been changed and her dogs were missing.

While some of the details of the events that occurred while Sue Evers was absent from the property are disputed, the essential sequence of events is undisputed.  Apparently Jill Akard was out-of-state when the property was transferred to Sue Evers in the fall of 2001.  When Jill Akard returned to the Albuquerque area in early 2002, she began disputing Sue Evers' ownership of the property.  Jill Akard spoke to the Torrance County Sheriff's Office about the disputed ownership of the property several times prior to March 2004.  Each time, Jill Akard was told that property disputes were a civil matter that had to be resolved in the judicial system. On March 31, 2004, after Sue Evers left 10 Red Diamond Road for Albuquerque, Jill Akard called the Torrance County Sheriff's Office via dispatch and requested assistance with the removal of a trespasser from her property.

Deputy Kenneth Chavez responded to the call and accompanied the Akards,[7] as well as Andrew Akard's stepson, Defendant Dustin Ray, to 10 Red Diamond Road.  The Akards told Deputy Chavez that Sue Evers was living in their trailer without their permission and that they wanted to enter the home.  The Akards showed Deputy Chavez documents they asserted demonstrated that they owned the property.  Deputy Chavez attempted to make contact with Sue Evers at the home but she was not present.  While Sue Evers was not present, her three dogs were on the property, one tied up and two running loose.[8]  Unsure how to handle the situation, Deputy Chavez requested that additional officers come to the property "to assist in making a decision on whether the Akards were able to enter the home while another person is living there." Chavez Incident Report at 1.

The officers who responded to Deputy Chavez's request were Detective Chuck Dubois and Sergeant Mark Satterfield.[9]  Jill Akard showed Sergeant Satterfield and Detective Dubois

---

[7]  It is unclear from the record if Andrew Akard was present at 10 Red Diamond Road on March 31, 2004.  Construing the facts in the light most favorable to Plaintiffs, however, the Court will presume that he was present.

[8]  There is conflicting evidence regarding the number of dogs on the property and how many of these dogs were tied and how many were running loose.  The number of dogs, however, is not material to any of the issues raised in the motions for summary judgment.  The condition of the dogs is also in dispute.  County Defendants contend that the dogs were abandoned and had no food or water.  Sue Evers, however, has provided testimony from Cindy Sullivan, Director of the Torrance County Animal Shelter, that the dogs did not appear to be malnurished when they were transported to the shelter.  In addition, the animal control officer who removed Sue Evers' dogs noted that there were numerous empty dog food bags piled up against the side of the trailer.  Construing this evidence in the light most favorable to Sue Evers, a jury could find that the dogs were not abandoned or left without food or water.

[9]  Torrance County Code Enforcement Officer Richard Ledbetter may also have been present at the property but there are no allegations in the summary judgment motions that Officer Ledbetter participated in any of the events that took place that day.

4

documents she asserted indicated that the Akards owned the property.  None of the officers asked for identification to verify whether the identity of the persons showing them the paperwork matched the paperwork and none of the officers can remember what documents Jill Akard had purporting to demonstrate ownership.  Jill Akard told law enforcement officers at the property that Sue Evers claimed that she owned the property but that her deed was a forgery.  Jill Akard did not have a court order or an eviction notice and she did not have a key to the door.

Sergeant Satterfield and Detective Dubois determined that the documentation demonstrated that the Akards were the proper owners of the property.  Sergeant Satterfield and Detective Dubois then knocked all around the trailer, announcing police presence, but received no answer.  While Sergeant Satterfield did not believe that anyone was in the trailer, with Jill Akard's consent, he decided to enter the home because "if there was somebody squatting, they could be hiding and not answering to law enforcement."  Satterfield Depo. at 72.  Sergeant Satterfield crawled in a window of the home, possibly by stepping on Detective Dubois' knee, immediately went to the front door, opened it, and exited, leaving the door unlocked.  Detective Dubois then permitted the Akards to enter the home.  By his own words, Sergeant Satterfield believed that his actions "restored the property to the proper owners."  Satterfield Depo. at 77.   Similarly, Jill Akard characterized the events as the Torrance County Sheriff's Department "let[ting] us back in the trailer" and "Torrance County g[iving] [the trailer] back to us."  Jill Akard Depo. at  23-24.

When Sergeant Satterfield entered the trailer, he thought it looked like no one had been living there because there was trash all over the place and it was infested with mice.  Detective Dubois described the trailer as filthy, with trash strewn everywhere, raw sewage leaking from a pipe, and a terrible stench coming from inside the trailer.  He described the smell as "on the line of

something being dead in there."  Dubois Depo. at 55.  Detective Dubois asserts that Sergeant

Satterfield went into the trailer to search for a human body:

> Well, I believe Sergeant, when because of the odor, you know, and they, you
> know, Jill Akard was claiming it was her property and somebody was living in it,
> and all of this.  I think, the, you know, this is my opinion, the determination was,
> was there something dead in the trailer, a human body dead in there, and that's
> why I believe Sergeant Satterfield checked it out.

Dubois Depo. at 61-62.  Sergeant Satterfield, however, denies that he believed there was a dead

body in the trailer or that he entered to search for a dead body.  He contends that he thought he

"was involved in a criminal matter."  Satterfield Depo. at 70.

Detective Dubois and Sergeant Satterfield departed shortly after the Akards entered the

trailer.  One of the officers present called dispatch and asked them to advise Animal Control of the

dogs and to contact Torrance County Planning and Zoning about the condition of the property.

On April 1, 2004, Animal Control Officer Joe Kaberlien set a trap to catch the two loose

dogs at the property.  Officer Kaberlien captured one of the two loose dogs in the trap and Dustin

Ray, with Jill Akard's permission, authorized Officer Kaberlien to remove the trapped dog as well

as the dog that was chained at the property to the animal shelter.  There is no evidence in the

record that Officer Kaberlien was aware of the property dispute or the events that took place the

prior day.  The two dogs that were taken to the animal shelter on April 1, 2004, were euthanized

on April 6, 2004, before Sue Evers returned from her trip to Albuquerque.

On April 1, 2004, Richard Ledbetter, a Code Enforcement Officer working in Torrance

County's Planning and Zoning Department, came to the property and advised Dustin Ray, who

was at the property, that the property needed to be cleaned up.  Officer Ledbetter was at the

property at the same time Officer Kaberlien was there attempting to remove the dogs.

When Sue Evers returned to 10 Red Diamond Road with her friend Alfred Eichelberger[10] on or about April 11, 2004, she immediately contacted the Torrance County Sheriff's Office and advised them that she had been locked out of her house.  Deputy Gibson responded to the call and requested that Sue Evers meet him at the mailboxes near the property.  When Deputy Gibson arrived, he asked Sue Evers for proof of ownership.  Sue Evers showed him a tax bill in her son's name, which Deputy Gibson said did not prove that she owned the property.  When Sue Evers persisted in her claims of ownership, Deputy Gibson verbally and physically abused her, stomping on her foot and knocking out one of her teeth.  Deputy Gibson then called the Akards, who met him and Sue Evers at the mailboxes.  Deputy Gibson suggested that the Akards and Sue Evers meet with Detective Dubois regarding their property dispute.

At some point, on either April 11, 2004, or April 13, 2004, Sue Evers saw Officer Ledbetter, Dustin Ray and Andrew Akard drive by with some of her property in their trucks, including a 64" big screen TV and a red tool box.

On April 13, 2004, Sue Evers met with Detective Dubois.  Detective Dubois told her that the property dispute was a civil matter that had to be handled by the court system.  Sue Evers claims that Detective Dubois then ordered four unidentified officers to take her to jail and book her so that she would stop complaining about the loss of her property.  After her release from jail, Sue Evers returned to the property to look for Hoss, her dog that animal control had been unable to capture.  When she arrived at the property, Hoss ran up to her wagging his tail.  Officer Ledbetter, who had followed her to the property, shot Hoss three times in front of her.  Officer

---

[10]  Neither party has been able to locate Mr. Eichelberger, who is homeless and suffers from Alzheimers, and Mr. Eichelberger is not a party or a witness in this case.

Ledbetter then knocked Sue Evers into some bushes, injuring her head.

On the same day, Detective Dubois also met with the Akards and gave them the same advice--that the property dispute was a civil matter that had to be handled by the court system.

On May 7, 2004, Nora Aragon-Gallegos, Sue Evers' daughter, wrote a letter addressed to "Internal Affairs, Torrance County Sheriff, Sheriff Pete Golden," complaining about these events. The letter stated that  "I would like to file a formal complaint on my mother's behalf" and provided the name of her mother's attorney.  The letter was copied to New Mexico Legal Aid. On the same date, Sue Evers and Alfred Eichelberger, apparently with assistance from New Mexico Legal Aid, filed an "Incident/Police Report" with the Torrance County Sheriff's Office describing the events that occurred between April 11-13, 2004, including the allegations that Deputy Gibson verbally and physically abused Sue Evers, that Officer Ledbetter, the Akards, and Dustin Ray were seen removing Sue Evers' belongings in their trucks, and that Officer Ledbetter shot Hoss in front of Sue Evers and pushed her when she tried to stop him.  Attached to this report was a five-page, handwritten list of personal property Sue Evers claimed she had in the trailer at 10 Red Diamond Road at the time the Akards took possession.

Detective Dubois drafted two reports regarding the incidents at issue.  The first report is dated May 11, 2004.  In this report, Detective Dubois details his April 13, 2004 meetings with Sue Evers and the Akards regarding their dispute over the property located at 10 Red Diamond Road.  Detective Dubois states that he advised all parties that it was a civil matter that may need to be decided by a judge.  The report then notes that the property "was checked by this office a week before and it was found to be in a sub standard [sic] condition." Dubois May 11, 2004 Report at 1.  The report does not state that Detective Dubois himself was on the property, that

8

any search for a dead body occurred, or that Sergeant Satterfield forcibly entered the trailer and opened the locked front door.  In closing, Detective Dubois states that, after hearing from Officer Ledbetter that her dogs had been taken by animal control, "Sue Evers left the Sheriffs [sic] office in a very distraught manner."  *Id*.

On May 20, 2004, Detective Dubois drafted a second supplemental report.  This report states that on that date, the Akards came to the Sheriff's Office and wanted to have Sue Evers arrested.  The Akards claimed that the warranty deed Sue Evers had was a forgery.  Detective Dubois advised the Akards that he would speak to the District Attorney's office regarding the matter.  In closing, the report noted that "[a]t this time, Sue Evers has filed an internal affairs complaint against Sgt. C. Gibson.  In here [sic] complaint she has stated that he struck her in the mouth and broke a tooth."  Dubois May 20, 2004 Report at 1.

Once the Akards obtained possession of the property, Jill Akard had Florenio Aragon's two vehicles, as well as the personal property he had stored in the vehicles, removed from 10 Red Diamond Road.  Florenio Argon took no steps to locate his vehicles or the personal property they contained.

Sue Evers and Alfred Eichelberger subsequently filed a Notice of Claim pursuant to the New Mexico Tort Claims Act.  The notice is dated July 9, 2004, and the Return Receipt shows that the copy addressed to the Torrance County Clerk was signed for on July 12, 2004.

Sue Evers and the Akards continued to contest ownership of the property although it does not appear that any legal action to establish ownership was commenced by either party.  In 2005, Sue Evers filed for a restraining order against the Akards, Dustin Ray and Detective Dubois on the grounds that these persons continued to threaten and harass her to get her to abandon her

claim of ownership to 10 Red Diamond Road.  The claims against Detective Dubois were dismissed but a restraining order was issued against the Akards and Dustin Ray.  Despite the restraining order, Jill and Andrew Akard were later convicted of physically assaulting Sue Evers.

On April 11, 2006, Sue Evers, by her next best friend Nora Aragon-Gallegos, and Florenio Aragon, Jr., filed a complaint against the Board of Commissioners of Torrance County, Torrance County Sheriff Pete Golden, Torrance County Manager Bob Ayre, Detective Dubois, Deputy Gibson, Officer Ledbetter, Andrew Akard, Jill Akard and Dustin Ray alleging violations of state and federal law.  An Amended Complaint was filed on August 7, 2006.  In their Amended Complaint, Plaintiffs assert the following claims:  Count I:  42 U.S.C. § 1983 illegal entry without a warrant;  Count II: 42 U.S.C. § 1983 unlawful seizure of property/deprivation of property without due process; Count III:  42 U.S.C. § 1983 unlawful detention; Count IV:  42 U.S.C. § 1983 false arrest/imprisonment; Count V:  42 U.S.C. § 1983 excessive force; Count VI:  42 U.S.C. § 1983 municipal liability for violation of constitutional rights; Count VII:  42 U.S.C. § 1983 conspiracy with state officials to deprive constitutional rights; Count VIII:  battery; Count IX:  false detention; Count X:  deprivation of property rights/trespass; Count XI:  deprivation of property rights/conversion; Count XII:  violation of state constitutional rights; Count XIII:  failure to perform statutory duty; Count XIV:  intentional infliction of emotional distress; and Count XV:  negligent training/supervision.

Count XIV was subsequently dismissed for failure to state a claim and default judgments were entered against Andrew Akard and Dustin Ray.  Plaintiffs and County Defendants are now seeking summary judgment on various counts in Plaintiffs' Amended Complaint.

## LEGAL STANDARD

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the nonmoving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chem. Co., Inc.,* 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Pittsburg & Midway Coal Min. Co. v. Yazzie,* 909 F.2d 1387, 1427 (10th Cir. 1990), the burden on the moving party may be discharged by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case, *Celotex,* 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law "because the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 322.

## DISCUSSION

### I.  Qualified Immunity--Counts I and II

County Defendants assert a qualified immunity defense for all individual County Defendants to Plaintiffs' Counts I and II, which allege illegal entry without a warrant and unlawful seizure of property/deprivation of property without due process.[11]  Section 1983 provides that "[e]very person" who acts under color of state law to deprive another of constitutional rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  Although this statute "on its face admits of no immunities," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), the Supreme Court has recognized several, including the doctrine of qualified immunity, which exempts government officials from suits for civil damages under certain circumstances.

Qualified immunity is intended to balance two concerns.  On one hand, when an official abuses his office, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  On the other hand, exposing government officials to damages suits "entail[s] substantial social costs," *Anderson v. Creighton*, 483 U.S. 635, 638 (1987), such as "the expenses of litigation, the diversion of official energy from pressing public issues, . . . the deterrence of able citizens from acceptance of public office ... [and the deterrence of public officials from] 'the unflinching discharge of their duties.'"

---

[11]  Count I is brought against Detective Dubois and Officer Ledbetter and Count II is brought against Detective Dubois, Deputy Gibson, and Officer Ledbetter.

*Harlow*, 457 U.S. at 814.

The Supreme Court has attempted to strike the balance between these two concerns by shielding government officials from suits for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818.  Although courts have derived from this statement a variety of multi-part tests, the essential inquiry is whether an objectively reasonable official would have known that his conduct was unlawful.  *See Anderson*, 483 U.S. at 640.  The Tenth Circuit employs a three-step inquiry.  *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1239-40, 1247, 1251 (10th Cir. 2003).  First, the court determines "whether the plaintiff's allegations, if true, establish a constitutional violation." *Id*. at 1239-40.  If not, the suit is dismissed; if so, the court moves to the second step: "whether the law was clearly established at the time the alleged violations occurred." *Id*. at 1247.  This step gives the official an opportunity to show that he "neither knew nor should have known of the relevant legal standard" because the law was not clearly established at the time he acted.  *Harlow*, 457 U.S. at 819.  The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains.  *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002).

If the law was clearly established, the court reaches the third step of the inquiry: whether, in spite of the fact that the law was clearly established, "extraordinary circumstances"--such as reliance on the advice of counsel or on a statute--"so 'prevented' [the official] from knowing that his actions were unconstitutional that he should not be imputed with knowledge of a clearly established right." *Roska*, 328 F.3d at 1251.  This occurs only rarely and the defendant bears the

13

burden of proving such circumstances.  *Pleasant v. Lovell*, 876 F.2d 787, 794 (10th Cir. 1989).

"If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably

competent public official should know the law governing his conduct. Nevertheless, if the official

pleading the defense claims extraordinary circumstances and can prove that he neither knew nor

should have known of the relevant legal standard, the defense should be sustained. But again, the

defense would turn primarily on objective factors."  *Harlow*, 457 U.S. at 818-19.

    If a plaintiff meets his or her burden of demonstrating that the defendant violated a

constitutional right and the constitutional right was clearly established at the time of the alleged

conduct, the defendant must then satisfy the usual summary judgment standard of showing that no

material facts are in dispute and that he or she is entitled to judgment as a matter of law.  *Clark v.*

*Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008); *Nelson v. McMullen*, 207 F.3d 1202, 1206

(10th Cir. 2000).  When the record shows an unresolved dispute of fact relevant to this immunity

analysis, a motion for summary judgment based on qualified immunity should be denied.  *Olsen v.*

*Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

## A.    Count I:  Illegal Entry Without a Warrant

    Plaintiffs allege that Detective Dubois and Officer Ledbetter illegally entered the property

at 10 Red Diamond Road without a warrant in violation of the Fourth Amendment.[12]  The Fourth

Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers,

---

[12]  Plaintiffs' Amended Complaint appears to misname the various defendants.  For example, Plaintiffs' illegal entry claim is brought against Officer Ledbetter, who probably was not even present at the property and undisputedly did not enter the home or assist in the entering of the home, and is not brought against Sergeant Satterfield, the officer who entered the home and "restored" it to its proper owners.

and effects, against unreasonable searches and seizures, shall not be violated."[13]  U.S. Const.

amend IV.  "A 'search' occurs when an expectation of privacy that society is prepared to consider

reasonable is infringed.  A 'seizure' of property occurs where there is some meaningful

interference with an individual's possessory interests in that property."  *United States v. Jacobsen*,

466 U.S. 109, 113 (1984).  The Supreme Court has emphasized that "physical entry of the home

is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton v. New

York*, 445 U.S. 573, 585 (1980).

The unauthorized entry by police officers into a person's home is a search invoking the

protections of the Fourth Amendment, regardless of the reasons for the entry.  As stated by the

Supreme Court:

> In our view, the reason why an officer might enter a house or effectuate a seizure
> is wholly irrelevant to the threshold question whether the Amendment applies.
> What matters is the intrusion on the people's security from governmental
> interference. Therefore, the right against unreasonable seizures would be no less
> transgressed if the seizure of the house was undertaken to collect evidence, verify
> compliance with a housing regulation, effect an eviction by the police, or on a
> whim, for no reason at all.

*Soldal v. Cook County,* 506 U.S. 56, 69 (1992) (internal cites and quotation omitted).

Whether the Fourth Amendment was in fact violated by this search requires determining if

the search was reasonable.  It is a "'basic principle of Fourth Amendment law that searches and

seizures inside a home without a warrant are presumptively unreasonable.'"  *Groh v. Ramirez*,

540 U.S. 551, 559 (2004) (quoting *Payton*, 445 U.S. at 586) (some internal quotation marks

---

[13]   The Fourth Amendment's protection against unreasonable searches and seizures fully
applies in the civil context. *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 67, n. 11 (1992) ("[W]e
reaffirm today our basic understanding that the protection against unreasonable searches and
seizures fully applies in the civil context."); *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th
Cir. 2004).

omitted)).  Nevertheless, because the ultimate touchstone of the Fourth Amendment is

"reasonableness," the warrant requirement is subject to certain exceptions.  *Flippo v. West*

*Virginia*, 528 U.S. 11, 13 (1999) (per curiam); *Katz v. United States*, 389 U.S. 347, 357 (1967).

County Defendants argue that entering the trailer was reasonable under the circumstances

either because a person with actual or apparent authority[14] gave them permission to enter or

because the smell indicated the potential presence of a dead body, authorizing entry pursuant to

the emergency or exigent circumstances doctrine.[15]

### i.    Apparent Authority

County Defendants assert that their actions did not run afoul of the Fourth Amendment

because Jill Akard had apparent authority to authorize entry into the home.  When the police seek

_____

[14]  While County Defendants assert that Jill Akard had actual or apparent authority to consent to entry into the trailer house, County Defendants do not provide any argument regarding Jill Akard's actual authority.  In fact, it does not appear that actual authority could be demonstrated because the undisputed facts are that Jill Akard, who had been absent from the property for several years, did not have a key to the property much less any use of or control over the property.  *See U.S. v. Cos*, 498 F.3d 1115, 1125 (10th Cir. 2007) (holding that actual authority to consent to a search of a residence requires "(1) mutual use of the property by virtue of joint access, *or* (2) control for most purposes over it.") (emphasis in original).  Consequently, the Court will only address the argument that Jill Akard had apparent authority.

[15]  County Defendants, in passing, also claim that Plaintiffs had no reasonable expectation of privacy in the property because it looked abandoned.  The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object.  *United States v. Burbage*, 365 F.3d 1174, 1178 (10th Cir. 2004).  "An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts."  *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993).  County Defendants were told by Jill Akard that Sue Evers was living on the property and that Sue Evers claimed ownership of the property; Sue Evers' personal property was in the trailer; Sue Evers' dogs were on the property; and Florenio Aragon's cars were parked on the property.  While there is some evidence that the trailer was unkempt, Detective Dubois described the trailer as not unusually messed up, but more like a "bad housekeeper...like somebody just didn't keep the place up."  Dubois Depo. at p. 82-83.  These facts, coupled with the fact that the doors to the trailer were locked, are sufficient for a jury to find that Plaintiffs retained a reasonable expectation of privacy in the property.

to conduct a search on the basis of apparent authority and the surrounding circumstances make the issue of authority ambiguous, an officer is obligated to inquire further rather than proceed with the search.  As the Supreme Court explained, "[e]ven when the invitation [to search] is accompanied by an explicit assertion that the person [has authority to consent], the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).  If the facts available to the officer would not support the belief "that the consenting party had authority over the premises," then "warrantless entry without further inquiry is unlawful unless authority actually exists." *Id*. at 188-89.  "The government cannot establish that its agents reasonably relied upon a third party's apparent authority if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.  If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry."  *United States v. Waller*,  426 F.3d 838, 846, (6th Cir. 2005).

Construing the facts in the light most favorable to Plaintiffs, at the time Jill Akard authorized the officers to enter the home at 10 Red Diamond Road, the officers knew that ownership of the property was in dispute and that the person who lived there claimed to own the property.  Jill Akard had shown the officers documents allegedly demonstrating that she owned the property as well as a deed in Sue Evers' name that she asserted was a forgery.  Sue Evers' pets were present on the property as well as Florenio Aragon's cars and, notably, Jill Akard did not have a key to the door.  These circumstances were sufficiently ambiguous to trigger County Defendants' obligation to inquire further before proceeding with an entry based on Jill Akard's

17

consent.  Defendants' decision to enter the home based on Jill Akard's apparent authority to authorize entry was unreasonable and a violation of the Fourth Amendment.

## ii.     Exigent Circumstances

In the alternative, County Defendants contend that warrantless entry was authorized pursuant to the emergency or exigent circumstances doctrines because the smell indicated the potential presence of a dead body.  "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey,* 437 U.S. at 393-394.  The Supreme Court has held that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.  *Id.* at 392.  "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."  *Id.* at 392-393 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

While the Tenth Circuit recognizes that there is "no absolute test for the presence of exigent circumstances, because such a determination ultimately depends on the unique facts of each controversy," *United States v. Justice*, 835 F.2d 1310, 1312 (10th Cir. 1987), it has provided a general framework for analyzing a claim of exigent circumstances:

> The basic aspects of the "exigent circumstances" exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

*United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986).

Several courts have found that reports of a dead body constitute exigent circumstances permitting a warrantless entry into property. The logic behind the exception is that a report of a dead body is an emergency situation because the person may not actually be dead but may be in need of immediate aid. *See, e.g., United States v. Richardson*, 208 F.3d 626, 627-31 (7th Cir. 2000) (finding that a report of a raped and murdered woman constituted an emergency situation because the person could still be alive and in need of assistance). In this case, however, there was no report of a dead body. Instead, one officer at the scene of an alleged trespassing believed that the smell emanating from the trailer was consistent with a decomposing body.

A few courts have addressed the situation where officers have been asked to investigate an odor consistent with a decomposing body. Most of these cases, however, have involved situations in which circumstances in addition to the odor of decomposing flesh, were relied upon to support a finding that a warrantless entry into a building to search for victims was justified under the emergency exception. *See, e.g., People v. Brooks*, 7 Ill. App. 3d 767 (1st Dist. 1972) (emergency circumstances justified warrantless entry into an apartment when the elderly resident of the apartment was missing and an odor generally associated with a dead body emanated from the apartment because the odor of a dead body did not negate the possibility that the woman may have been severely injured under intolerable circumstances, such as rotting flesh after severe burns or other injuries, thereby justifying the need for immediate police action); *Hughes v. Com.*, 87 S.W. 3d 850 (Ky. 2002) (officer had a reasonable belief that the victim might be inside the apartment and in need of emergency assistance, justifying the warrantless entry, despite the defendant's claim that the officer should have known when he smelled the odor of decomposing human remains that the victim was no longer in need of assistance; officer had information that

19

the victim had been reported missing for two days and that she had failed to pick up her children after leaving them with relatives, that she and the defendant had experienced marital problems, that the defendant had refused another officer's earlier request to see the victim on the excuse that she was asleep, and an odor consistent with that of a decomposing body was emanating from inside the apartment); *State v. Scott*, 343 N.C. 313 (1996) (warrantless entry lawful where police, responding to a report of a missing woman, knocked on the front door of the house shared by the woman and her male companion and received no response despite the fact that there were two vehicles in the driveway, the officer noticed green flies and the smell of rotting flesh at the access door to the underside of the house, and on one previous occasion while investigating a missing person's report, the officer smelled a strong odor of decaying flesh but the person was still alive).

   Courts are split on whether the presence of an odor consistent with that of a decomposing body, standing alone, is sufficient to justify a warrantless entry pursuant to the exigent circumstances doctrine.  In *People v. Molnar*, 98 N.Y.2d 328 (2002), the court held that police entry into an apartment in response to a call alerting them to a "strange odor" that suggested to them that it might have been caused by a rotting body was constitutional under the emergency exception to Fourth Amendment.  In making this determination, the court found it significant that the police were not functioning in a criminal arena but acting as public servants in the name of protecting public health and safety, and that such circumstances did not lend themselves to criminal processes, like obtaining search warrants.  The court further noted that the police proceeded with restraint and took the time to deliberate, using force only after exhausting other reasonable avenues.

   At least one other court, however, has found that the odor of a dead or decomposing

body, standing alone, is not sufficient to justify warrantless entry into a building under the emergency exception.  In *Condon v. People*, 176 Colo. 212 (1971), the court held that the odor of a dead or decomposing body does not create, in and of itself, an emergency sufficient to justify a warrantless search.  In that case, police, responding to a real estate agent's call that a house he rented out had an odor of a decomposing body emanating from the basement, detected the odor and entered the house by breaking through the glass in the back door. The police went to the basement only after searching the upper floors and the closets and cupboards on those floors, wherein the officers recovered marijuana and paraphernalia.  No body was ever recovered, and the odor was discovered to come from various chemicals in the basement. The court found that the officers' actions in searching the basement last was inconsistent with the professed intent of the entry to search for a body, and even if there had been a body, there would have been no hope of revival, rendering the emergency doctrine inapplicable.  The court stated that:

> We are of the opinion that the odor of a decomposing body, however unpleasant and discomforting, does not give rise to an emergency in and of itself sufficient to allow an invasion of the privacy of the defendant's home without a search warrant. It would have been a small matter indeed, when weighed against the intrusion involved, for one officer to obtain a warrant, for which there was certainly probable cause, while another kept the premises under surveillance if this was deemed necessary. There was no apparent danger to any person or property. To put the matter sharply, if there had been a decomposing body, there would be no hope of revival at any rate. It is also well to note here an incongruity in the police actions during the search. After testifying to their concern with the odor emanating from the two basement windows, the evidence then discloses that the basement was searched only after the upstairs bedrooms, the main floor, and the closets and cupboards on these floors had been searched. These preliminary searches were unwarranted under the circumstances and appear highly inconsistent with the original intent of the entry onto the premises.

*Condon*, 176 Colo. at 218-19.

In this case, the only circumstance cited by County Defendants as justifying a warrantless

entry pursuant to the emergency or exigent circumstances doctrine is that one of the three officers at the scene of an alleged trespassing believed the smell emanating from the trailer was consistent with the odor of a decomposing body.  The officer who entered the trailer did not believe the odor indicated a decomposing body and thought he was "involved in a criminal

matter."[16]  None of the County Defendants asserts that they believed the odor indicated that a person may be injured and in need of immediate assistance or that they associated an emergency with the area.  County Defendants have failed to establish that the circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house required immediate assistance and, consequently, the warrantless entry was not authorized pursuant to the exigent circumstances doctrine.  *See Smith*, 797 F.2d at 840 (stating that "exigent circumstances" generally requires that law enforcement officers have some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched and have reasonable grounds to believe that there is an immediate need to protect their lives or others).

As the evidence supports a finding that County Defendant's entry into the home was not authorized by a person with apparent authority or by exigent circumstances, Plaintiffs have stated a claim for a violation of the Fourth Amendment and the Court must determine if the law was clearly established at the time of the violation.  There is no question that the law regarding an

---

[16]  The fact that Sergeant Satterfield asserts that he was entering pursuant to a criminal matter further undermines County Defendants' exigent circumstances argument.  *See Smith*, 797 F.2d at 840 (exigent circumstances require that search *not* be motivated by an intent to arrest and seize evidence).

officer's duty to investigate before conducting a search on the basis of apparent authority when

the surrounding circumstances make the issue of authority ambiguous was clearly established at

the time of the incident at issue. *See, e.g., Rodriguez*, 497 U.S. at 188.  Whether the law that an

odor consistent with a decomposing body under the circumstances of this case did not authorize a

warrantless entry under the exigent circumstances doctrine was clearly established presents a

closer question.  Ordinarily, for a rule to be clearly established there must be a Supreme Court or

Tenth Circuit decision on point, or the clearly established weight of authority from other courts

must have found the law to be as the plaintiff maintains.  *Casey v. City of Federal Heights*, 509

F.3d 1278, 1284 (10th Cir. 2007).  However, this does not mean that there must be a published

case involving identical facts; otherwise a court would be required to "find qualified immunity

wherever we have a new fact pattern." *Id*.  Instead, "a general constitutional rule can apply with

obvious clarity to the specific conduct in question, even though such conduct has not previously

been held unlawful." *Id*. (quotation marks and alterations omitted).

The Court finds that the law was not clearly established such that a reasonable officer

would have known that his conduct was unlawful in this situation.  While the law regarding the

basic aspects of the exigent circumstances exception was clearly established, as noted by the

Tenth Circuit, there is "no absolute test for the presence of exigent circumstances." *Justice*, 835

F.2d  at 1312.  The situation-specific nature of the exigent circumstances exception combined

with the lack of caselaw regarding whether the smell of a decomposing body, standing alone, is

sufficient to constitute exigent circumstances precludes a finding that the exigent circumstances

exception obviously did not apply to the conduct in question.

Normally, a finding that the constitutional right violated was not clearly established would

end the Court's inquiry and the defendant would be entitled to qualified immunity.  This is one of those exceptional cases, however, in which historical facts material to the qualified immunity analysis are in dispute.  *See Keylon v. City of Albuquerque*, 2008 WL 2967658 (10th Cir., Aug. 5, 2008) (noting that the Tenth Circuit recognizes that "in exceptional circumstances historical facts may be so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant's position would have known that his conduct violated that right.").  County Defendants are not entitled to qualified immunity for this claim because their actions, construed in the light most favorable to Plaintiffs, are inconsistent with an entry to search for an injured or dead person.  Detective Dubois asserts that entry was made to check for a dead body.  The officer who actually entered the home--Sergeant Satterfield--claims he entered to look for squatters, not a dead body.  Sergeant Satterfield did not conduct a search of the trailer for squatters or dead bodies but, instead, entered a window, walked directly to the front door, unlocked it, and exited.  Detective Dubois then permitted the Akards to take possession of the trailer.  Notably, Detective Dubois' reports on the incident do not even mention the alleged decomposing body odor, much less state that entry was made because officers were concerned that someone in the trailer may need immediate assistance.

Which version of the facts is believed is dispositive of whether County Defendants' conduct was objectively reasonable.  Since the record demonstrates the existence of a disputed material fact regarding the reason for the warrantless entry, County Defendants' motion for summary judgment on Count I based on qualified immunity must be denied.

## B.  Count II:  Unlawful Seizure/Procedural Due Process

In Court II, Plaintiffs assert that Detective Dubois, Deputy Gibson and Officer Ledbetter

24

seized their property in violation of the Fourth Amendment and deprived them of property

without due process of law in violation of the Fourteenth Amendment when Detective Dubois,

Deputy Gibson and Officer Ledbetter "reassigned" Plaintiffs' property to the Akards, when

Officer Ledbetter stole Plaintiff Evers' personal property, ordered the killing of two of her dogs

and killed one dog, and when Deputy Gibson and Officer Ledbetter aided the Akards and Dustin

Ray in stealing Sue Evers' property.


While Count II of Plaintiffs' Amended Complaint alleges that County Defendants' actions

violated both Plaintiffs' Fourth Amendment and Fourteenth Amendment rights, the Tenth Circuit

considers these separate and distinct claims.  Under Tenth Circuit law, the initial seizure of

property by police officers is analyzed under the Fourth Amendment while the ultimate disposition

of that property is analyzed under the Fourteenth Amendment.  *See Winters v. Bd. of County

Comm'rs*, 4 F.3d 848, 853, 856 (10th Cir. 1993) (initial seizure of personal property by police is

analyzed under the Fourth Amendment but the ultimate disposition of the property has to comply

with the protections of procedural due process); *Snider v. Lincoln County Bd. of County Com'rs*,

2008 WL 2278840 (10th Cir. 2008) (same); *see also Price-Cornelison v. Brooks*, 524 F.3d 1103

(10th Cir. 2008) (analyzing similar claim alleging police officer's interference allowed third party

to take plaintiff's personal property under the Fourth Amendment).  Because Plaintiffs have

lumped their Fourth Amendment and Fourteenth Amendment claims together, it is difficult for the

Court to determine the precise nature of Plaintiffs' claims.   After a careful review of Plaintiffs'

Amended Complaint, however, it appears that Plaintiffs are challenging only the initial seizure of

their property by County Defendants, or by private parties aided by County Defendants, and are

not asserting any claims regarding the ultimate disposition of their property. Consequently, the Court will consider all of Plaintiffs' claims in Count II under the Fourth Amendment and not under the Fourteenth Amendment.

Plaintiffs allege that after Detective Dubois, Deputy Gibson, and Officer Ledbetter determined that the Akards were the rightful owners of the property, Officer Ledbetter entered the home and unlocked the front door in order to allow the Akards to gain possession of the home and property. This case is analogous to cases addressing police officer involvement in private party repossessions of property. In *Marcus v. McCollum*, 394 F.3d 813 (10th Cir. 2004), an automobile owner brought an action against the police officers who were present when a creditor and tow service had his automobile towed from his driveway, alleging that the officers violated his Fourth Amendment and due process rights. In analyzing these claims, the Tenth Circuit stated that one of the ways law enforcement presence at a repossession may rise to state action is if the officer "unreasonably recognizes the documentation of one party over another." *Id*. at 819 (citing *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir. 1998). The Tenth Circuit, while recognizing that the circumstances must be "examined in their totality," stated that "the overarching lesson of the case law is that officers may act to diffuse a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance." *Id*. at 819; *see also Price-Cornelison,* 524 F.3d at 1117-1118 (police officer telling plaintiff over the phone that she would be arrested if she returned to her home and attempted to stop her former domestic partner from removing plaintiff's property from the home enabled her former domestic property to seize plaintiff's property in violation of the Fourth Amendment).

County Defendants argue that they did not deprive Plaintiffs of any property interests

because none of the County Defendants made any determination regarding ownership of the property.  The facts, taken in the light most favorable to Plaintiffs, suggest otherwise.  County Defendants, knowing that ownership of the property was in dispute and that the person living at the property claimed ownership (and without even requesting identification from the persons claiming an interest in the property but who, notably, had no key to the property), determined that the Akards were the rightful owners and worked together to enter the property through a window and unlock the front door.  By opening the door and allowing the Akards to take possession of the property, County Defendants impermissibly made a determination of "ownership" in favor of the Akards and deprived Plaintiffs of their protected property interests.  As stated by Deputy Chavez in his report, Satterfield and Dubois "did determine that the Akard's [sic] paperwork indicated that the [sic] are the rightful owner's [sic] . . .."  Chavez Incident Report at 1.

In this case, as in *Marcus*, the police officers unreasonably credited the Akards' ownership claim over Sue Evers' ownership claim and, in determining that the Akards were the rightful owners and then entering the home and unlocking the door, went beyond simply keeping the peace, as they were entitled to do, and actively assisted the Akards in gaining possession of the disputed property.[17]  There is also evidence that, absent the assistance of the officers, the Akards

---

[17]  Both Detective Dubois and Deputy Kenneth Chavez describe the situation as a "civil-type situation" involving a property dispute in which officers are there on a "Civil Stand-by."  *See* Dubois Depo. at 65 and Chavez Incident Report at 1.  Deputy Chavez's report states that "Sgt. Satterfield and Detective DuBois showed up a little later and did determine that the Akard's paperwork indicated that they are the rightful owner's and at this time Sgt. Satterfield, Detective Dubois and myself stood by for a Civil Stand-by while the Akard's made entry."  Chavez Incident Report at 1.  The next sentence of Deputy Chavez's report inexplicably states that Sergeant Satterfield "entered though the south living room window, with the permission of the Akard's, and opened the south door."  *Id.*  No explanation is given regarding how a "civil stand-by" resulted in an officer entering the home and unlocking a door to allow one party to a property dispute to take possession.

27

would not have gained possession of the property.  *See* Jill Akard Depo. at 99-100 (testifying that she would not have entered the home without the officers).

County Defendants further argue that they did not deprive Florenio Aragon of any property because they did not reasonably know that the Akards would remove Florenio Aragon's vehicles or that Florenio Aragon would take no steps to recover his vehicles.  In entering a window and opening the front door to "restore" the property to the Akards, County Defendants set in motion a series of events that they knew or reasonably should have known would permit the Akards to obtain control of Plaintiffs' personal property located at 10 Red Diamond Road, including Florenio Aragon's vehicles and the property stored in those vehicles. *See Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) ("For liability under section 1983 . . . the requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)).

The law was unquestionably clear in March, 2004, that a police officer's assistance in a private party's seizure of property violates the Fourth Amendment.  As early as 2002, the Tenth Circuit stated that "federal law recognizing that an unlawful repossession can amount to state action and a deprivation of property actionable under § 1983, are both clearly established." *Marcus,* 394 F.3d at 824; *see also Price-Cornelison*, 524 F.3d  at 1118 (citing *Marcus* as evidence that the law that an officer's assistance in a private party's seizure of property implicates Fourth Amendment protections was clearly established by February of 2002). Construing the facts in the light most favorable to Plaintiffs, County Defendants are not entitled to qualified immunity on this claim.

Once again, however, historical facts are so intertwined with the law that a qualified immunity determination is inappropriate on the claim against Detective Dubois.  Plaintiffs assert that Detective Dubois, knowing that ownership of the property was in dispute and that the person living in the home claimed ownership, reviewed the documentation provided by the Akards and determined that the Akards were the proper owners.  Detective Dubois then assisted Sergeant Satterfield in climbing through a window and opening the door.  Once Sergeant Satterfield opened the door, Detective Dubois allowed the Akards to enter the home.

Detective Dubois' version of events is quite different.  He contends that he assisted Sergeant Satterfield in gaining entry into the house to search for a potential dead body and that as soon as Sergeant Satterfield opened the door and announced that there was no dead body, he left the scene without ever seeing the Akards enter the home.

Which version of the facts is believed is dispositive of whether Detective Dubois' conduct was objectively reasonable.  Since the record demonstrates the existence of a disputed material fact regarding whether Detective Dubois allowed the Akards to enter the home after the purported search for a dead body, qualified immunity is inappropriate on this claim.  *See, e.g., Farmer*, 288 F.3d at 1259.

Having determined that the individual County Defendants are not entitled to qualified immunity on either Count I or Count II, the Court will now analyze the remaining grounds for the parties' summary judgment motions.

## II.   Summary Judgment Analysis

### A.  Count I:  Section 1983 Illegal Entry Without A Warrant

In Count I, Plaintiffs allege that Detective Dubois and Officer Ledbetter deprived Plaintiffs of their Fourth Amendment right to be free of unreasonable searches and seizures when they illegally entered Plaintiffs' home without a warrant or other lawful justification and unlocked the door to permit the Akards to take possession of Plaintiffs' real and personal property.  County Defendants move for summary judgment on this count on behalf of  Detective Dubois and Officer Ledbetter while Plaintiffs seek summary judgment against Detective Dubois.  The Court will consider the claims against each defendant separately.

### i.  Detective Dubois

As discussed above, material factual disputes exist as to the purpose of the entry into the home.  The existence of this dispute prevents summary judgment from being appropriate on this claim for either party.

### ii.  Officer Ledbetter

It is unclear if Officer Ledbetter was even at the property at the time the alleged illegal entry was made but, even if he was present, there is no evidence that he participated in the determination that the Akards were the proper owners or in the decision to enter the home and unlock the door.  In the absence of evidence that Officer Ledbetter participated in these actions, Defendent Ledbetter is entitled to summary judgment on the claim that he deprived Plaintiffs of property in violation of the Fourth Amendment when he illegally broke into the Plaintiffs' home.

### B.  Count II:  Unlawful Seizure/Deprivation of Property Without Due Process

In Court II, Plaintiffs assert that Detective Dubois, Deputy Gibson and Officer Ledbetter seized their property in violation of the Fourth Amendment and deprived them of property without due process of law in violation of the Fourteenth Amendment when Detective Dubois,

Deputy Gibson and Officer Ledbetter "reassigned" the property to the Akards, when Officer

Ledbetter stole Sue Evers' personal property, ordered the killing of her dogs and killed one dog,

and when Deputy Gibson and Officer Ledbetter aided the Akards and Dustin Ray in stealing Sue

Evers' property.  County Defendants seek summary judgment on this claim on behalf of all named

defendants while Plaintiffs seek summary judgment only against Detective Dubois.

As discussed above, under Tenth Circuit law, the initial seizure of personal property by

police officers is analyzed under the Fourth Amendment while the ultimate disposition of that

property is analyzed under the Fourteenth Amendment.  *See Winters,* 4 F.3d  at 853 & 856 (initial

seizure of personal property by police is analyzed under the Fourth Amendment but the ultimate

disposition of the property has to comply with the protections of procedural due process); *Snider,*

2008 WL 2278840 (same).  As Plaintiffs appear to be challenging the initial seizure of their

property and not its disposition, the Court will consider Plaintiffs' Count II as alleging claims

solely under the Fourth Amendment.

### i.  Detective Dubois

As discussed above, material factual disputes exist as to the purpose of the entry into the

home and whether Detective Dubois allowed the Akards to enter the home after Sergeant

Satterfield unlocked the door.  The existence of disputed material facts precludes summary

judgment for either party on this claim.

### ii.  Deputy Gibson

Sue Evers contends that Deputy Gibson assisted the Akards in depriving her of her

personal property in the trailer by detaining her at the mailboxes while the Akards hauled off her

property in their truck.  This allegation, while supported only by Sue Evers' testimony, is

sufficient to withstand a motion for summary judgment on this claim.

### iii.  Officer Ledbetter

Sue Evers alleges, in part, that Officer Ledbetter took a large screen television from her home on or about April 13, 2004.  This allegation, while supported only by Sue Evers' testimony, is sufficient to withstand a motion for summary judgment on this claim.  Sue Evers also asserts that Officer Ledbetter violated her Fourth Amendment rights when he ordered the killing of two of her dogs and when he personally shot her dog Hoss.  Dogs are personal property.  *See, e.g., Bess v. Bracken County Fiscal Court,* 210 S.W.3d 177 (Ky. Ct. App. 2006) (owners of a dog may not be deprived of the dog without notice and a hearing since dogs are personal property); *City of Pierre v. Blackwell*, 635 N.W.2d 581 (S.D. 2001) (same).  Sue Evers has come forward with no evidence that Officer Ledbetter was involved in the removal of the two dogs from the property and summary judgment will be granted to Officer Ledbetter on the claim that the removal of two dogs from the property violated Sue Evers' constitutional rights.[18]  The claim that Officer Ledbetter seized Sue Evers' property when he shot Hoss, while supported only by Sue Evers' testimony, is sufficient to withstand summary judgment.

### iv.  Plaintiff Aragon's Claims

County Defendants seek summary judgment on Florenio Aragon's claims on the grounds that Jill Akard, not County Defendants, had Florenio Aragon's cars and personal belongings

---

[18]  Sue Evers also appears to assert that contacting animal control regarding the dogs at the property violated her rights.  It is undisputed that one of the officers at the property on March 31, 2004, called animal control regarding the dogs at the property.  Sue Evers has come forward with evidence suggesting that Sergeant Satterfield called animal control although Sergeant Satterfield denies making this call.  Even if contacting animal control could support a due process or unlawful seizure claim, in the absence of any evidence that Officer Ledbetter placed such a call, summary judgment will be granted in his favor on this claim.

removed from the property.  In entering a window and opening the front door to "restore" the property to the Akards, County Defendants set in motion a series of events that they knew or reasonably should have known would permit the Akards to obtain control of Plaintiffs' personal property located at 10 Red Diamond Road, including Florenio Aragon's vehicles and the property stored in those vehicles.  *See Snell,* 920 F.2d at 700 ("For liability under section 1983 . . . the requisite causal connection is satisfied if the defendant sets in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97

(7th Cir. 1988)).[19]  County Defendants' motion for summary judgment on these grounds will be denied.

### D.  Count IV  False Arrest/False Imprisonment under 42 U.S.C. § 1983

In Count IV, Sue Evers asserts that Detective Dubois ordered four John Does "to detain [her] and to transport her to jail and run her through the booking process" and that the John Does violated her rights when they did so.  Detective Dubois seeks summary judgment on this count on the grounds that Sue Evers has not identified the John Does involved in this alleged incident, that

---

[19]  County Defendants assert that Florenio Aragon's claim is barred because he did not seek to mitigate his damages by attempting to recover his property from the Akards.  This is a damages question, not a liability question. *See, e.g., Air Ruidoso, Ltd. v. Executive Aviation Ctr., Inc.*, 1996-NMSC-042, ¶ 14 ("It is a well established principle in New Mexico that an injured party has a responsibility to mitigate its damages, or run the risk that any award of damages will be offset by the amount attributable to its own conduct.").

Sue Evers has provided no evidence supporting her allegations that Detective Dubois ordered her arrest, and that even if the John Does had violated her rights, as alleged, Detective Dubois would not be liable for their actions as there is no *respondeat superior* liability under § 1983.

In her response to County Defendants' motion for summary judgment, Sue Evers does not specifically address this claim.  Sue Evers, however, does provide her own testimony that Detective Dubois ordered her arrest.  This testimony is sufficient to defeat Detective Dubois' motion for summary judgment on the claim that he ordered Sue Evers' arrest and imprisonment. *See Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992) (plaintiff may demonstrate liability under § 1983 by showing that a defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance); *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976) (holding in a Bivens action that "before a supervisor may be held for acts of an inferior, the superior ... must have participated or acquiesced in the constitutional deprivations").  As there is no *respondeat superior* liability under § 1983, the Court will grant summary judgment in favor of Detective Dubois on any claims that Detective Dubois is responsible for independent violations of Plaintiff Evers' rights by the John Doe defendants.  *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

### F.  Count VI:  Municipal Liability

In Count VI, Plaintiffs assert that Defendants Torrance County, Torrance County Manager Bob Ayer, and Torrance County Sheriff Pete Golden are liable for the actions of Detective Dubois, Deputy Gibson and Officer Ledbetter because they failed to properly train or supervise these employees regarding how to handle property disputes.  County Defendants have moved for summary judgment on this claim on the grounds that Plaintiffs have not come forward

34

with any evidence to support such a claim.

As an initial matter, both Bob Ayer and Pete Golden are officers or employees of Torrance County.  The Supreme Court has held that neither states nor state employees sued in their official capacities are "persons" within the meaning of 42 U.S.C. § 1983.  *See, e.g., Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989) ("A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.")(internal cites and quotes omitted); *Harris v. Champion*, 51 F.3d 901, 906 (10th Cir. 1995)("a state official who acts in his or her official capacity" is not a "person" under § 1983).  Consequently, Plaintiffs' § 1983 claims against these defendants in their official capacities are barred and will be dismissed.

A municipality may not be held liable under 42 U.S.C. § 1983 simply because it employs a person who violated a plaintiff's federally protected rights.  *Monell,* 436 U.S. at  694.  Instead,  "a plaintiff suing a county under section 1983 for the actions of one of its officers must demonstrate two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. County Bd. of County Com'rs*, 151 F.3d 1313, 1318 (10th Cir.1998).  A plaintiff can "use a municipality's failure to train as one way to make the required showing that a municipal policy or custom was the 'moving force' behind an already established constitutional deprivation." *Id*. at 1317.  However, "the failure to train must amount to deliberate indifference to the rights of persons with whom the police come into contact." *Id*. at 1318 (quotation omitted). Ordinarily, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability."  *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).  In the

case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-85 (1986); *Butler*, 992 F.2d at 1055 (the plaintiff must prove the single incident was "caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"). The fact that a specific harm could have been avoided if additional training had been provided is not sufficient to support a failure to train claim under § 1983. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

Plaintiffs have failed to come forward with sufficient evidence to withstand summary judgment on this claim. Although Plaintiffs have provided evidence demonstrating that certain officers may have committed constitutional violations, Plaintiffs have not taken the subsequent step of linking these alleged constitutional violations to a municipal custom or policy. Plaintiffs have not provided any evidence of Torrance County's customs or policies; have not alleged facts linking the potential individual violations to the broader municipal policies; have not come forward with sufficient evidence regarding the training, or lack of training, received by the officers; have made no effort to link the actual training provided to these officers to the events at issue in this case; have not provided evidence of any other incidents similar to this incident; and have not provided any evidence that the illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of Torrance County. Further, Plaintiffs have made no showing of any deliberate indifference on the part of Torrance County with respect to training on the handling of property disputes. Instead, Plaintiffs simply assert that Torrance County's failure to train is "evident from the testimony that everything

Satterfield or Detective Dubois did with the respect to the deprivation of Plaintiff Evers' property interests without a hearing and to the warrantless entry was consistent with the Torrance County's policies."  This assertion is not sufficient for purposes of imposing municipal liability under § 1983 for failure to train.

Plaintiffs have failed to come forward with any evidence from which a reasonable trier of fact could determine that the execution of any Torrance County policy or custom inflicted Plaintiffs' injury such that Torrance County could be held liable under § 1983. *See City of Canton*, 489 U.S. at 385.  Consequently, summary judgment will be granted in favor of County Defendants on this claim.

### G. Count VII:  Conspiracy

In Count VII, Plaintiffs allege that Defendants Jill Akard, Andrew Akard, and Dustin Ray "acted with the help of, and/or in concert with Defendants Dubois, Gibson and Ledbetter" to deprive Plaintiffs of their constitutional rights.  As noted above, default judgments have been entered against Defendant Andrew Akard and Defendant Dustin Ray.  Defendant Jill Akard did not file a response to Plaintiffs' motion for summary judgment on this claim.  Failure to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.  D.N.M.LR-Civ. 7.1(b).

 "Allegations of conspiracy may . . . form the basis of a § 1983 claim." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). "However, a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants," *id*., and "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim," *id*. (quotation omitted).  Further, "a deprivation of a constitutional right is essential to proceed under

a § 1983 conspiracy claim." *Snell,* 920 F.2d at 701-02.  Thus, to prevail on such a claim, "a

plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of right a right

secured by the Constitution and laws." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir.

1990).

As a private citizen, Jill Akard can be held liable under § 1983 only if she was a "willful

participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

There is no question that Jill Akard was a willful participant in the joint action with County

Defendants.  After being told several times that a property dispute was a civil matter that had to

be handled through the court system, Jill Akard telephoned the Torrance County Sheriff's

Department and requested assistance in removing a trespasser from her property.  Once the

officers arrived at the property, Jill Akard, knowing that ownership of the property was disputed,

requested that the officers enter the trailer and "restore" it to her.

What is disputed, however, is whether, as a result of this joint action, a deprivation of any

constitutional rights occurred.  The facts related to the alleged constitutional violations committed

by Officer Ledbetter, Detective Dubois and/or Deputy Gibson as a result of this concerted action

are in dispute such that summary judgment is not appropriate for either party.

### H.  Tort Claims

Counts VIII through XV allege various tort claims against County Defendants.  The New

Mexico Tort Claims Act provides the exclusive remedy for a tort action brought against a

governmental entity or public employee.  *See* NMSA § 41-4-17 ("The Tort Claims Act shall be

the exclusive remedy against a governmental entity or public employee for any tort for which

immunity has been waived . . . .").  The Tort Claims Act retained governmental immunity except

for eight enumerated classes of activity, including certain unlawful acts by law enforcement officers. *See* NMSA § 41-4-4 (granting immunity from tort liability for "a governmental entity and any public employee while acting within the scope of duty . . . except as waived by Sections 41-4-5 through 41-4-12"). As to torts committed by law enforcement officers, the Tort Claims Act waives immunity for injuries "resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." NMSA § 41-4-12.

## 1. Notice

County Defendants assert that Plaintiffs failed to provide notice of their state law tort claims within 90 days of the date they allegedly occurred, as required by the Tort Claims Act. Under the Tort Claims Act, a defendant has the burden of proving that the notice requirement was not met. *Ferguson v. New Mexico State Highway Comm'n*, 98 N.M. 718 (Ct. App. 1981), *rev'd on other grounds*, 98 N.M. 680 (1982).

Section 41-4-16 of the Tort Claims Act provides that

A. Every person who claims damages from the state or any local public body under the Tort Claims Act shall cause to be presented to . . . the county clerk of a county for claims against the county . . . within ninety days after an occurrence giving rise to a claim for which immunity has been waived under the Tort Claims Act, a written notice stating the time, place and circumstances of the loss or injury.

B. No suit or action for which immunity has been waived under the Tort Claims Act shall be maintained and no court shall have jurisdiction to consider any suit or action against the state or any local public body unless notice has been given as required by this section, or unless the governmental entity had actual notice of the occurrence. The time for giving notice does not include the time, not exceeding ninety days, during which the injured person is incapacitated from giving the notice

39

by reason of injury.

NMSA §  41-4-16.

The purpose of the statutory notice requirement contained in the Tort Claims Act is to ensure that the governmental agency allegedly at fault is given notification that it may be subject to a lawsuit. *New Mexico State Highway Comm'n v. Ferguson*, 98 N.M. 680 (1982); *Martinez v. City of Clovis*, 95 N.M. 654 (Ct. App. 1980). The defense of lack of proper notice, however, does not apply to claims against individual defendants. *See Dutton v. McKinley County Bd. of Comm'rs*, 113 N.M. 51, 52-53 (Ct. App. 1991) (written notice requirement of § 41-4-16 does not apply to filing of tort claims against public employees); *Frappier v. Mergler*, 107 N.M. 61, 65, (Ct. App. 1988) (notice requirement of Tort Claims Act inapplicable to public employees).

On May 7, 2004, Nora Aragon-Gallegos wrote a letter addressed to "Internal Affairs, Torrance County Sheriff, Sheriff Pete Golden," complaining about some of the events alleged in this lawsuit.  The letter stated that "I would like to file a formal complaint on my mother's behalf" and provided the name of her mother's attorney.  County Defendants deny that the letter and memo were received by the Sheriff, the County Clerk, or the County Manager.  County Defendants' assertion is belied by the fact that the supplemental police report prepared by Detective Dubois on May 20, 2004, references Sue Evers' internal affairs complaint.  Dubois May 20, 2004 Report at 1 ("At this time, Sue Evers has filed an internal affairs complaint against Sgt. C. Gibson . . . In her complaint she has stated that he struck her in the mouth and broke a tooth.").  Nonetheless, even if received, Nora Aragon-Gallegos' May 7, 2004 letter is insufficient to constitute written notice because it was not sent to the county clerk as required by NMSA §

41-4-16(A).[20]

The Court must still consider whether the County, nevertheless, had actual notice of

Plaintiffs' claims.  Under § 41-4-16(B), "actual notice" rather than written notice may be given,

provided that the particular agency that caused the alleged harm is notified within ninety days

after an occurrence giving rise to the claim for which immunity has been waived that "it may be

subject to a lawsuit." *City of Las Cruces v. Garcia*, 102 N.M. 25 (1984) (" . . . under some

circumstances, a police or other report could serve as actual notice under Subsection 41-4-16(B),

but only where the report contains information which puts the governmental entity allegedly at

fault on notice that there is a claim against it."); *Powell v. New Mexico State Highway & Transp.*

*Dep't*, 117 N.M. 415, 419 (Ct. App. 1994) (notice established when "the agency allegedly at fault

... [has] actual notice that litigation will likely be the result of the accident").


As a general rule, whether or not notice has been given or received is a question of fact to

be determined by the trier of fact but whether written notice is sufficient is a question for the

court. *See Smith v. State ex rel. New Mexico Dept. of Parks and Recreation*, 106 N.M. 368, 371-

72 (Ct. App. 1987).  Plaintiffs assert that the County had actual notice of their claim because of:

(1) the May 7, 2004 letter sent to the Sheriff's department by Nora Aragon-Gallegos; and (2) the

May 7, 2004 memo sent to the Torrance County Sheriff's Department by Sue Evers and Alfred

Eichelberger.  The May 7, 2004 letter describes the events underlying this law suit and states Sue

---

[20] In a letter dated July 9, 2004, Sue Evers and Alfred Eichelberger filed a notice of claim pursuant to the New Mexico Tort Claims Act.  This letter was sent to the Torrance County Clerk but may not have been received within the 90-day period.  Because the Court has found that the County had actual notice within the notice period, the question of whether this letter was timely need not be reached.

41

Evers' intent to file a "formal complaint."  Importantly, the letter provides the name of Sue Evers'

attorney for further discussions and the letter was copied to New Mexico Legal Aid.  Construing

the facts in favor of Plaintiffs, the Court finds that a reasonable factfinder could find that someone

in the Sheriff's Department received the May 7, 2004 letter.  As a matter of law, the Court finds

the May 7, 2004 letter sufficient to put the County on notice of a potential claim.

Neither the May 7, 2004 letter, the May 7, 2004 memo, nor the July 9, 2004 Notice of

Claim filed by Sue Evers and Alfred Eichelberger mention any potential claims by Florenio

Aragon.  In the absence of any evidence that notice of Florenio Aragon's tort claims was provided

within 90 days, summary judgment will be granted to Defendant Torrance County on  Florenio

Aragon's tort claims.

### B.  Statute of Limitations

Next, County Defendants assert that some of Plaintiffs' tort claims are barred by the

statute of limitations.  Under New Mexico law, "[a]ctions against a . . . public employee for torts"

must be commenced "within two years after the date of occurrence resulting in loss, injury or

death," NMSA § 41-4-15.  Plaintiffs argue that the statute of limitations should begin running at

the time Sue Evers returned to 10 Red Diamond Road and discovered the occurrences resulting in

loss and not from the date the loss occurred.  The Court can find no support for this interpretation

in the case law.  Outside medical malpractice cases, where New Mexico courts have found that

medical malpractice actions brought under the Tort Claims Act accrue when the plaintiff knows or

with reasonable diligence should have known of the injury and its cause, the Court has not located

any cases holding that the statute of limitations accrues when a plaintiff discovers a loss even

though the loss was physically apparent and discoverable from the date it occurred.  The Court,

42

therefore, will decline to find that the statute of limitations accrued when Plaintiffs discovered the loss rather than on the date the loss occurred.

Plaintiffs' Complaint was filed on April 11, 2006.  Consequently, any tort claims based on occurrences prior to April 10, 2004, are barred by the statute of limitations.

### 3.  Tort Claims Against Officer Ledbetter

County Defendants assert that all tort claims against Officer Ledbetter must be dismissed because he is not a law enforcement officer within the meaning of the Tort Claims Act.  The Tort Claims Act only provides a waiver of immunity for certain enumerated torts committed by law enforcement officers.  NMSA § 41-4-12.

The Tort Claims Act defines a law enforcement officer as a "full-time salaried public employee of a governmental entity whose principal duties under the law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes . . .." NMSA § 41-4-3(D).  The plain terms of § 41-4-3  and the New Mexico cases interpreting the statute, require that the "principal duties" of a person be traditional law enforcement functions before that person will be considered a "law enforcement officer" under the statute.   "[T]he primary inquiry concerns review of the employee's day-to-day duties, responsibilities, and activities.  These duties and responsibilities are then measured against the admittedly amorphous standard of the duties and activities traditionally performed by law enforcement officers." *Coyazo v. State*, 120 N.M. 47, 50 (Ct. App. 1995); *see also Baptiste v. City of Las Cruces*, 115 N.M. 178 (Ct. App. 1993) (in order to be a law enforcement officer under the Tort Claims Act, an employee must devote the majority of his or her time to performing duties of a direct law enforcement nature).

43

Officer Ledbetter submitted an affidavit describing his job duties.  In this affidavit, he

states:

> Although I am authorized to issue citations for zoning violations, I do not have the
> authority to, nor do I, detain or arrest people, hold people in custody or otherwise
> engage in law enforcement activities such as maintaining public order.  I am
> authorized to file misdemeanor complaints by petitioning the Court and to obtain
> and execute search warrants in prosecuting those cases.  If the problem is severe,
> then I am authorized to submit an affidavit for arrest, which is turned over to the
> Sheriff's office for execution.
>
> *  *  *
>
> In approximately 1989 I was hired to work as a dispatch officer for Torrance
> County.  At that time I was cross commissioned as a special deputy but it is my
> understanding that I did not have the authority to arrest or detain people without
> the supervision of a certified law enforcement officer.  I never perform any duties
> in my capacity as a cross commissioned special deputy and performing any such
> duties is not a part of my job as a Planning and Zoning employee.

Ledbetter Affidavit at 1.

Plaintiffs provide no legal argument or evidence on this issue.  In their response to County

Defendants' undisputed facts, Plaintiffs assert that Officer Ledbetter is a law enforcement officer

because "he testified that he worked as a certified law enforcement officer under supervision of

the Sheriff's supervision [sic], and his affidavit says he has power to arrest and engage in other

law enforcement activities under supervision."  Plaintiffs misapprehend New Mexico law.  New

Mexico law focuses on what an employee does on a daily basis, not the authority an employee

may have.  *See Baptiste,* 115 N.M. at 181 (an employee is "law enforcement officer" only if the

majority of the employee's time is devoted to duties traditionally performed by law enforcement

officers); *Montes v. Gallegos*, 812 F.Supp. 1165, 1172 (D.N.M. 1992)(holding that mayor is not

a law enforcement officer under Tort Claims Act, notwithstanding his statutory authority and

obligation to exercise law enforcement functions, because his principal duties are not of a direct

law enforcement nature).

The evidence provided is insufficient for the Court to determine if Officer Ledbetter is a law enforcement officer within the meaning of the Tort Claims Act.  While Officer Ledbetter's affidavit discusses what he is authorized to do, there is no indication what his day-to-day duties, responsibilities and activities are and whether any of his duties and activities are traditionally performed by law enforcement officers.  Without this information, the Court cannot determine if Officer Ledbetter is a law enforcement officer within the meaning of the Tort Claims Act and Officer Ledbetter is not entitled to summary judgment.

### 4.  Count XIII and Count XIV

County Defendants argue that the state law tort claims asserted in Count XIII (failure to perform statutory duty) and Count XIV (Intentional Infliction of Emotional Distress) must be dismissed because there is no waiver of immunity under the Tort Claims Act for such claims.  Count XIV has been dismissed by stipulation of the parties so the Court need not consider County Defendants' arguments regarding that claim.  At least part of Count XIII appears to be barred by the statute of limitations because it is based on events that occurred prior to April 10, 2004.  In addition, Plaintiffs failed to respond to County Defendants' motion regarding the waiver of immunity for a failure to perform a statutory duty.[21]  Consequently, Plaintiffs are deemed to have conceded this claim and summary judgment will be granted in favor of County Defendants on Count XIII.

---

[21]  The legal argument in Plaintiffs' Response is sparse.  After devoting over twenty pages of their response to a factual narrative, Plaintiffs spent less than six pages addressing the many legal arguments made by County Defendants.  As a result, Plaintiffs provided only cursory legal argument on several counts and wholly failed to address other counts.

**5.  Count XV (negligent training/supervision)**

In Count XV, Plaintiffs alleged that Defendants Ayre, Golden, and Torrance County negligently supervised and trained Detective Dubois, Deputy Gibson and Officer Ledbetter, and that this negligent supervision and training proximately caused these officers to deprive Plaintiffs of their rights, privileges, and immunities secured by the laws and constitutions of the United States and New Mexico.  County Defendants seek summary judgment on this count on the grounds that 1) there is no waiver of immunity under the Tort Claims Act for any such claims except as they relate to law enforcement officers; 2) the claims as related to law enforcement officers fail because County Defendants have not committed any torts for which there is a wavier of immunity and have not violated any of Plaintiffs' civil rights; and 3) Plaintiffs have produced no evidence establishing that any particular training would have prevented their alleged injuries.

Plaintiffs provided no response to County Defendants' motion for summary judgment on this claim and, therefore, are deemed to have conceded this claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that County Defendants' Motion for Summary Judgment on Counts I, II, IV, VI - XV of Plaintiffs' Amended Complaint, filed September 6, 2007, **[Doc. No. 125]**, and County Defendants' Motion for Summary Judgment Regarding Florenio Aragon's Claims Against the County Defendants, filed September 13, 2007, **[Doc. No. 136]**, are **GRANTED in part** as follows:

1.  Summary judgment is granted in favor of Officer Ledbetter on Count I.

2.  Summary judgment is granted in favor of Officer Ledbetter on all claims in Count II asserting that Officer Ledbetter was involved in the removal of two of Sue Evers' dogs from 10 Red Diamond Road.

46

3.      Summary judgment is granted in favor of Detective Dubois on all claims that Detective Dubois is responsible for independent violations of Sue Evers' rights by the John Doe defendants.

4.      Summary judgment is granted in favor of Defendants Bob Ayer and Pete Golden on Plaintiffs' 42 U.S.C. § 1983 claims against them in their official capacities.

5.      Summary judgment is granted in favor of Defendants Torrance County, Bob Ayer and Pete Golden on Count VI.

6.      Summary judgment is granted in favor of Defendant Torrance County on Florenio Aragon's tort claims.

7.      Summary judgment is granted in favor of County Defendants on all tort claims based on events that occurred prior to April 10, 2004.

8.      Summary judgment is granted in favor of County Defendants on Count XIII and Count XV.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment Against Defendants DuBois and Dunn, and Against Potential Defendant Satterfield as to Counts I, II, and VII, filed October 17, 2007, **[Doc. No. 164]**, is **DENIED** in its entirety.

DATED this 30th day of September, 2008.

_____
MARTHA VÁZQUEZ
Chief District Court Judge

Attorneys for Plaintiff:
        Carolyn M. Nichols, Esq.
        Marc M. Lowry, Esq.

Attorney for County Defendants:
        Beth German, Esq.

Attorney for Defendant Gibson:
        Jonlyn Martinez, Esq.

Jill Akard Dunn, *pro se*